Filed 7/13/15  Christina P. v. Superior Court CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHRISTINA P., | D067882 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. EJ3763) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

PROCEEDINGS for extraordinary relief after reference to a Welfare and Institutions Code section 366.26 hearing.[1]  Gary M. Bubis, Judge.  Petition denied; request for stay denied.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Dependency Legal Group of San Diego and John P. McCurley for Petitioner.

No appearance by Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Dependency Legal Group of San Diego and Caitlin Zaback for Real Party In Interest, Casidy P., a Minor.

Christina P. seeks writ review and stay of a juvenile court order denying reunification services as to her minor daughter, Cassidy P., and setting a section 366.26 hearing. Christina contends that the order terminating her reunification services was not supported by substantial evidence. We deny the petition and Christina's request for a stay.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2014, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of one-month-old Cassidy P. under section 300, subdivisions (a) and (b). The subdivision (a) count alleged that on December 31, 2013, Cassidy's parents exposed her to the risk of serious physical harm from violent confrontations between the parents involving the use of physical force. Specifically, the petition alleged that Christina became intoxicated while caring for Cassidy at a New Year's Eve party that the parents were attending. While Christina was visibly inebriated, she and the father engaged in an argument that included shouting, kicking, and hitting.

2

Cassidy "was in the midst of the altercation . . . ." The petition further alleged that the parents have a history of domestic violence.

The section 300, subdivision (b) count alleged that Cassidy was at substantial risk of serious physical harm or illness because of Christina's inability to provide regular care for her due to Christina's mental illness, developmental disability, or substance abuse.[2] Christina allegedly used alcoholic beverages to excess, as evidenced by her becoming "extremely intoxicated while caring for [Cassidy] and [falling] with the baby in her arms after 'doing shots' at a party . . . ." The subdivision (b) count further alleged that the father also abused alcohol and marijuana and that the parents' continued substance abuse rendered them unable to provide regular care for Cassidy. Cassidy was detained with a paternal uncle under a safety plan.

The Agency received a referral on January 2, 2014, stating that Christina and the father were living together despite a restraining order against the father that protected Christina and four of Cassidy's older half siblings. Christina and the father attended a New Year's Eve party and Christina became intoxicated. While the father was in a Jacuzzi with some female friends, Christina kicked him in the back of the head and then

---

[2]     Effective June 20, 2014, subdivision (b) of section 300 was redesignated subdivision (b)(1). (Stats. 2014, ch. 29, § 64.) Subdivision (b)(1) provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

3

stumbled and fell on her buttocks while holding Cassidy in her arms. A friend of Christina's older daughter, Ashley, attempted to help Christina get up. Christina pushed Ashley and took a swing at her, and yelled jealous remarks about the father and his companions. Christina started fighting with Ashley while holding Cassidy. Several people intervened and separated Christina and Ashley, and the father grabbed Cassidy and took her inside the house.

Christina insisted on leaving the party with Cassidy, but the party hosts and other guests prevented her from doing so. The owner of the home and a guest drove Christina home and kept her keys so that she could not drive drunk. The father left the party on foot with Cassidy. He later returned with her and someone gave him a ride to the paternal grandmother's house.

The father told an Agency social worker that the next morning he was walking to a store to buy supplies for Cassidy and passed by Christina's home, which was in the same trailer park as the father's home. Christina was outside. She antagonized him by saying "come on, come on," and then approached him and pulled a pocket knife on him. The father returned to the grandmother's home and called the police. When the social worker asked the father about violating the restraining order, he denied having any knowledge of a restraining order against him.

Christina told the social worker that she went to bed after she was driven home from the party, and was awakened at 4:00 a.m. when the father knocked on her door. She told him to go away and called the police to report that he had Cassidy. The police told her that the father had a right to have Cassidy with him. The next thing Christina

4

remembered was the police coming to her house and arresting her for pulling a knife on the father. She reported that the father was aware of the restraining order that was in place.

The restraining order against the father was issued in September 2013 as a result of several domestic violence incidents between the parents that occurred while Christina was pregnant with Cassidy. Those domestic violence incidents resulted in Christina losing custody of two of her children to their biological father. According to Christina, Cassidy's father moved back into her home in November 2013 without her permission. She explained that she let him stay in her home because "he is the father of my child," and had not called the police because she "didn't want to be alone."

Christina and the father were both arrested on January 1, 2014. Christina was arrested for assault with a deadly weapon and the father was arrested for violating the restraining order. The father reported to a social worker that after Christina was released, she called him several times and threatened him because her house had been broken into and some of her belongings had been stolen. The father left the social worker a voice mail message on January 8 stating that Christina had returned some of his belongings with a note that read, "Protect [your] family snitch ass bitch."

The social worker spoke with Christina in jail after Cassidy was taken into protective custody. Christina denied having a drug or alcohol problem. She said that she had an expired medical marijuana card that was issued to her for depression and anxiety, but that she had not smoked marijuana since she found out she was pregnant. She drank two to three beers per week before her pregnancy. She had a baggie containing white

5

powder in her house and the father thought the powder was methamphetamine. Christina could not identify what the powder was. She told the social worker that she obtained the baggie before she was pregnant and kept it in a safe with her prescription medications, but could not explain why. The father told the social worker that Christina had used pain pills during her pregnancy.

At the detention hearing, the court ordered that Cassidy be detained in the approved home of a relative, and that Christina and the father be provided reunification services and liberal supervised visitation. The parents were to visit Cassidy separately.

The Agency's jurisdiction/disposition report recounted Christina's report of being sexually and physically abused by her father when she was between the ages of 10 and 12. Her father died when she was 13 years old. After his death, Christina began drinking, smoking and acting out. She dropped out of high school and got a job. She reported that she was a hard worker and had been employed by the same company for 10 years as an "optician tech."

Christina had four children by her first husband, who raped her when she asked him to leave her home. The marriage was nullified because the husband was a bigamist. She had a fifth child, Lily, with another man before giving birth to Cassidy. Christina and Lily's father were together for five years and there was domestic violence between them. At the time of the jurisdiction/disposition report, Christina did not have custody of any of her children.

Christina admitted that she and the father knew they were violating the restraining order by living together. The father showed up at Christina's house two days before

6

Cassidy's birth and refused to leave despite Christina's telling him that he could not stay there. She said that the reason she had not called the police was because the father called her a snitch, and being called a snitch by a gang member had a "different meaning."

The Agency was "worried" about Christina's denial that she was an alcoholic despite her admission that she had blacked out twice while intoxicated. The Agency's assessment was that Christina had not taken responsibility for the events that brought Cassidy into protective custody. She had been in several relationships that involved domestic violence and had "not made any efforts to alleviate the issues to keep her children safe." The Agency recommended that the parents be provided six months of reunification services to address domestic violence and substance abuse issues, and to have the opportunity to show that they could provide a safe and stable environment for Cassidy.

The parties reached a settlement at the disposition hearing.[3] The court removed Cassidy from parental custody and ordered her placed in the approved home of a relative. The court directed the Agency to provide services to both parents and ordered reasonable unsupervised visitation for Christina. Christina's reunification services included attending AA (Alcoholics Anonymous) or NA (Narcotics Anonymous) meetings, random drug testing, a drug treatment program, a domestic violence program, general therapy, and a parenting class.

---

[3] The parents previously submitted on the petition at the jurisdiction hearing. The court made a true finding on the petition by clear and convincing evidence and set the contested disposition hearing.

7

In its status review report for the six-month review hearing, the Agency recommended terminating the father's reunification services and continuing Christina's services to the 12-month date. Social worker Tamara Meyer reported that Christina had been responsible in maintaining contact with her and addressing the protective issues that had caused Cassidy to be removed from her care. She was participating in reunification services and had "verbalize[d] an understanding of her need to follow the [c]ourt orders and make the necessary changes in her life in order to provide safety and stability for Cassidy."

Christina lived in a two-bedroom mobile home and had been employed full time as an optometric technician for over 10 years. She was financially able to provide for her basic needs. She had completed outpatient substance abuse treatment and told Meyer that she had been sober since January 1, 2014. She was participating in domestic violence treatment, parenting education, and individual therapy. Christina stated that she had no desire to resume a relationship with the father. Meyer reported that Christina "seems to have a good understanding of red flags for violent relationships and seems to have a general understanding of how exposure to domestic violence has negatively affected her children."

Christina's visitation with Cassidy had progressed to eight-hour unsupervised visits. Meyer observed Christina "to be attentive, nurturing and engaging with Cassidy." Cassidy's placement had been changed from her paternal uncle to her paternal grandmother, and she appeared to be thriving in her current placement. The paternal

grandmother was "excelling at meeting all of her needs[,]" and Cassidy appeared to have a close relationship with her grandmother.

Meyer reported that although she and Christina had "developed a good working relationship over the last few months, it seems at times [Christina] may not be completely forthcoming with her current circumstances and situation." Meyer's assessment was that "the current status of [Christina] is improving. Although the protective concerns have not been entirely resolved, it appears that should [Christina] continue to cooperate with the Agency and actively participate in her [court ordered] services, the risk to Cassidy's health and well-being by being in her mother's care would be significantly lessened and that she could safely be moved back with her."

The Agency filed an addendum report on December 8, 2014, in which it recommended that Christina's visitation with Cassidy be supervised due to safety concerns. Cassidy's caregiver, the paternal grandmother, reported that on November 6, she went to Christina's house to pick up Cassidy from a visit and arrived about 30 minutes early. Christina was outside and Cassidy was in the house by herself, watching television. Cassidy was strapped in her car seat and her diaper was very wet.

The next day (November 7), the grandmother left the social worker a voice mail message saying that the father had called her from Christina's house. The father told the grandmother that Christina had invited him over and that he was fighting with her. The grandmother could hear Christina screaming profanities at the father in the background. The grandmother asked the father to put Christina on the phone, but Christina did not

9

speak to the grandmother. The grandmother thought Christina was under the influence of alcohol because she did not sound like "the Christina I've been talking to."

On November 12, 2014, the grandmother reported that Christina told her that the father had pulled a knife on her (Christina) on November 7, and that the father had been seeing Cassidy. The grandmother visited the great-grandparents on November 20 and the father arrived at the great-grandparents' home while the grandmother was there. The father showed the grandmother photos on his cell phone of him with Cassidy at Christina's house. When Meyer asked Christina about what the grandmother had reported, Christina denied that the father had been to her home and denied having had any contact with him. She repeatedly said, "He's not welcome in my home." Christina also denied telling the grandmother that the father had pulled a knife on her.

Christina called the police on October 18, 2014, to report that the father had just left her home. She was adamant that she did not want the police to come to her house but she indicated that she wanted a police report. She did not report the incident to Meyer.

Meyer was concerned about Christina's failure to report that the father had been in her home in violation of the restraining order. Meyer stated that it was "concerning to the Agency that [Christina] is able to identify red flags for domestic violence but seems to be pursuing contact with the father." Meyer questioned Christina's understanding of the protective issues in this case and the need to place Cassidy's needs and safety above her own needs. Because the Agency was concerned about Christina's contact with the father, her failing to report that contact, and her allowing the father to have contact with Cassidy

10

during her unsupervised visits, the Agency filed a section 388 petition asking the court to change Christina's visitation from unsupervised to supervised.

At the six-month review hearing on December 16, 2014, the court granted the Agency's section 388 petition and ordered supervised visitation for Christina. The court echoed the Agency's concerns about Christina's progress with her domestic violence issues, commenting that Christina had not "internalized what she should be learning in the domestic violence program, and is not able to protect [Cassidy] against further domestic violence." The court gave the social worker "discretion to lift the supervision requirement." However, the court advised Christina that before she would be permitted to have unsupervised visitation, there would have to be "completely honest communication with the social worker about what has been going on with the father and what continues to go on with the father."

The court continued Cassidy's placement in the approved home of a relative, but found that Christina had made substantive progress with her case plan and that there was a substantial probability that Cassidy would be returned to her custody within the next six months. The court ordered the Agency to continue to provide reunification services to Christina but terminated the father's services, finding that he had not made substantive progress with his case plan.

In its status review report for the 12-month hearing, the Agency recommended that the court terminate Christina's reunification services and set a section 366.26 hearing. Meyer reported that her relationship with Christina had deteriorated. It had been difficult

11

for Meyer to obtain Christina's work schedule and Christina had not met with Meyer in January 2015.

Christina left Meyer a voice mail message on December 17, 2014, stating that the father had been to her house the night before and that she had called the police. Meyer confirmed that Christina had called the police to report that the father had been banging on her windows. The previous day, Christina had apologized to Meyer for not being truthful about the father's being in her home on November 7, 2014. Christina told Meyer that she had not invited him to her home, but she let him in rather than having him continue to bang on her door. She said that she should have called the police. Christina's "Family Support Partner" (FSP) in her parenting classes with Community Services for Families wrote in a monthly report for December 2014 that Christina had informed her that "she has contact with [the father,] which she knew she was not supposed to do." The FSP reported that Christina appeared distressed "and was very selective about which details she shared."

Meyer met with Christina on February 18, 2015, at Christina's NA/AA sponsor's house, where Christina was staying. Meyer asked Christina why she was staying with her sponsor. Christina responded that she had been involved in another domestic violence incident with the father. She told Meyer that on January 30, she was outside on her porch smoking a cigarette when the father approached her and said they needed to talk. Christina went into the house to call the police and the father followed her, forced his way into the house, and took the phone away from her before she could call the police. Christina thought he had been drinking. Over the course of two hours, the father choked

12

her six times. He called someone on the phone and talked about whether he was going to kill Christina or let her live. Christina feared for her life. When she tried to use her cell phone to call the police, the father took it from her and removed the battery. He threatened to kill her and her family if she "snitched." She finally escaped when he let her go to the kitchen to get a drink and she fled out the kitchen door to a neighbor's home. She believed that the father took a spare set of keys from the house, so she returned on another day with her sponsor and the sponsor's husband and changed the locks. Christina said that she felt safe in her home during the day but not at night. She did not think her home was a safe place for any of her children. She told Meyer that she had never initiated contact with the father.

Christina felt safe in her sponsor's home, but was not sure how long she could stay there. She did not intend to reside in her home any longer. The paternal grandmother reported to Meyer on January 12, 2015, that the father had called her to let her know that Christina was pregnant with his baby. Christina denied to Meyer that she was pregnant or that she had been pregnant since Cassidy's birth. She admitted to Meyer that she had intercourse with the father when he was in her home on November 7, 2014, but stated that that was the only time they had intercourse since Cassidy was removed from her care.

Meyer's assessment was that Christina had "verbalized insight into domestic violence dynamics, red flags and ways to set boundaries with Cassidy's father, however, [Christina] has failed to consistently demonstrate she has incorporated what she has learned into her life." When Meyer asked Christina in December 2014 why she had not

informed Meyer that the father had come to her house on October 18, Christina said she did not know that she was supposed to. Meyer told Christina that she was supposed to let Meyer know whenever the father violated the restraining order. Christina complied by calling Meyer on December 17 to report that the father had violated the restraining order the night before. However, Christina did not tell Meyer about the father's attack on her on January 30 until Meyer met with her on February 18.

Meyer reported that the Agency was "concerned about Cassidy's safety if she were to be returned to her parents' care at this time." Meyer reasoned that if Christina "is unable to keep the Agency informed of basic things, such as her work schedule to more serious things such as more domestic violence, the Agency is unable to trust that [Christina] will report additional violations or protective concerns if Cassidy is in her care, placing Cassidy at risk for harm." Meyer's overall assessment was that "the current status of [Christina] has declined." While Christina was able to "verbalize an understanding of the protective issues, she is unable to demonstrate her ability to keep her child safe." Meyer concluded: "Based on [Christina's] current status, it does not appear Cassidy will be returned by the 18[-]month date in July 2015 and Cassidy deserves a long-term plan. Therefore, the Agency respectfully recommends the mother's reunification services [be] terminated and a 366.26 hearing [be] set on behalf of Cassidy."

A court appointed special advocate (CASA) also filed a report for the 12-month review hearing. The CASA recommended that Cassidy remain in her current placement and that the court terminate Christina's reunification services and set a section 366.26 hearing. The CASA noted the recent incident in which the father attacked Christina in

14

her home and stated, "I believe [Christina] gets herself into situations which she needs to avoid, which unfortunately has not allowed her to focus on reunifying with Cassidy."

Meyer filed an addendum report on March 5, 2015, to report that according to Christina's therapist, the father assaulted Christina when she allowed him into her home on November 7, 2014. The therapist stated that Christina failed to call the police because she thought it would reflect badly on her in Cassidy's dependency case. Meyer noted that Christina had not reported the November assault to her and stated, "It is concerning that [Christina] appears to continue to hide important information from me."

Meyer filed a second addendum report on April 8, 2015, in which she reported that she met with Christina at court on March 5 and asked her whether the father had assaulted her on November 7, 2014. Christina said she was not sure she should discuss the matter without her attorney present. Meyer reminded Christina that she needed to know right away when there was a domestic violence incident. Christina said that she had not reported the incident to Meyer because she did not trust the Agency and that everything she said was used against her and that no one was helping her. Meyer reported that Christina continued to be selective about providing information and "has not demonstrated her ability to keep the Agency informed of situations and then is evasive when asked about situations, which would place Cassidy at risk [of] harm if she were placed in [Christina's] care."

At the 12-month review hearing, the court received in evidence Meyer's 12-month status review report; the addendum reports that Meyer filed on December 8, 2014, March 5, 2015, and April 8, 2015; the CASA report dated March 5, 2015; drug test results filed

that day; AA verification slips; and Meyer's curriculum vitae. After hearing closing argument, the court found by clear and convincing evidence that Christina had "made some progress with the provisions of [her] case plan," but that she had "not made significant progress in resolving the problems that led to [Cassidy's] removal from the home." Therefore, the court found that there was not a substantial probability that Cassidy would be returned to Christina's custody by the 18-month date. The court continued Cassidy's current placement, terminated Christina's reunification services, and set a section 366.26 hearing.

DISCUSSION

Christina contends that the court erred in terminating her reunification services and setting a section 366.26 hearing. She challenges the sufficiency of the evidence to support the court's finding that there was no substantial probability of Cassidy's return to her custody by the 18-month date. Christina asserts that she consistently visited and contacted Cassidy, made significant progress in resolving the problems that led to Cassidy's removal, and had the ability to complete the objectives of her treatment plan and provide for Cassidy's safety, protection and well-being.

Under section 366.21, subdivision (g)(1), the court may continue a case to the 18-month date only if it determines that there is a substantial probability that the child will be returned to the parent's physical custody and safely maintained in the home by that date. To make that determination, the court must find all of the following: (1) the parent has consistently and regularly contacted and visited the child; (2) the parent has made significant progress in resolving problems that led to the child's removal from parental

16

custody; and (3) the parent has shown the capacity and ability to complete the objectives of her treatment plan and provide for the child's safety, protection, physical and emotional well-being, and special needs. (§ 366.21, subd. (g)(1)(A)-(C).)

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.) On appeal, the parent has the burden of showing that the order is not supported by substantial evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

We conclude that substantial evidence supports the court's express finding that Christina had not made significant progress in resolving the problems that led to Cassidy's removal and, therefore, there was not a substantial probability that Cassidy would be returned to Christina's custody by the 18-month date. Further, we may imply a finding if it is supported by substantial evidence. (*Jose O. v. Superior Court* (2008) 169 Cal.App.4th 703, 708.) Substantial evidence also supports the implied finding that Christina did not show the capacity and ability to complete the objectives of her treatment plan and provide for Cassidy's safety, protection, and physical and emotional well-being, as required to continue her reunification services to the 18-month date. (§ 366.21, subd. (g)(1)(C).)

The main problem that led to Cassidy's removal was domestic violence. The Agency filed Cassidy's petition as a result of the domestic violence incident between Christina and the father that occurred after Christina voluntarily accompanied the father to a party despite the restraining order that prohibited the father from contacting her. Christina's case plan required her to comply with the restraining order by not allowing the father to be in her home and not having any contact with him. The case plan directed Christina to develop a domestic violence safety plan for herself and Cassidy and to call law enforcement if the father approached the home. The case plan also directed Christina to maintain regular telephone contact with the Agency to inform the social worker of her progress and obstacles in meeting the goals of the plan and reunifying with Cassidy, and to immediately inform the social worker of any changes in circumstances.

The evidence presented at the 12-month hearing showed that Christina had not made sufficient progress in resolving the domestic violence problem that gave rise to the dependency case. There were issues throughout the case with Christina's credibility and her failure to be forthcoming with the social worker about contact she had with the father. When Meyer initially asked Christina about the paternal grandmother's report that the father had been in Christina's home on November 7, 2014, and that Christina had told the grandmother that the father pulled a knife on her, Christina was evasive. She denied that the father had been in her home and denied that she had told the grandmother that the father pulled a knife on her. Christina called the police on October 18, 2014, to report that the father had just left her home, but did not report the incident to Meyer. Christina's

18

failure to report her contact with the father resulted in her visitation with Cassidy being changed from unsupervised to supervised.

Although Christina apologized to Meyer in December 2014 for not being truthful about the father's being in her home on November 7, she failed to mention that the father had assaulted her on November 7. Meyer first learned of Christina's claim that the father assaulted her on November 7 from Christina's therapist in March 2015. The therapist reported that Christina failed to call the police because she thought it would reflect badly on her in the dependency case. When Meyer asked Christina about the November 7 assault, Christina was reluctant to talk about it without her attorney present. Christina said that she did not report the incident to Meyer because she did not trust the Agency.

At the six-month review hearing the court expressed concern that Christina had not "internalized what she should be learning in the domestic violence program, and [was] not able to protect [Cassidy] against further domestic violence." The court admonished Christina to have "completely honest communication with the social worker about what has been going on with the father and what continues to go on with the father." Despite that admonition, Christina did not inform Meyer of the father's forced entry into her house and physical attack on her on January 30, 2015, until February 18, when Meyer asked her why she was staying with her sponsor. Meyer noted that although Christina feared for her life during the January 30 incident, she returned to her home alone to check her mail the following day.

In the 12-month review report, Meyer stated that the Agency was concerned about Cassidy's safety if she were to be returned to Christina's custody, and that the Agency

19

was unable to trust that Christina would "report additional violations or protective concerns if Cassidy [were] in her care, placing Cassidy at risk for harm." In her last addendum report before the 12-month hearing Meyer stated that Christina continued to be selective about providing information and had not "demonstrated her ability to keep the Agency informed of situations and then is evasive when asked about situations, which would place Cassidy at risk [of] harm if she were placed in [Christina's] care." The court was entitled to find Meyer's opinion credible and to give great weight to her assessment. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

Based on the evidence of Christina's repeated contact with the father during the dependency case despite court orders prohibiting it, and her evasiveness and reluctance to be forthcoming with the Agency about her contact and relationship with the father, the court could reasonably find that Christina had not made significant progress in resolving the domestic violence problem that led to Cassidy's removal, and had not shown the capacity and ability to complete the objectives of her treatment plan and provide for Cassidy's safety, protection, and physical and emotional well-being, as required to continue her reunification services to the 18-month date. Accordingly, substantial evidence supports the court's order terminating Christina's reunification services on the ground that there was not a substantial probability that Cassidy would be returned to Christina's custody by the 18-month date.

DISPOSITION

The petition is denied.  The request for stay is denied.


AARON, J.

WE CONCUR:


BENKE, Acting P. J.


NARES, J.

21